## UNITED STATES DISTRICT COURT
## MIDDLE DISTIRCT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| EMILY TORRADO, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.: |
| v. | |
| DIVIDEND SOLAR FINANCE, LLC; FIFTH THIRD BANK, NATIONAL ASSOCIATION d/b/a DIVIDEND FINANCE; and DIVIDEND FINANCE, INC., | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Emily Torrado brings this action on behalf of herself and all similarly situated individuals against Defendants Dividend Solar Finance, LLC, Fifth Third Bank d/b/a Dividend Finance, and Dividend Finance, Inc. (collectively, "Dividend"), and alleges:

## INTRODUCTION

1.      While solar energy can do much to benefit the environment, the industry that has grown up around it has been seeded with fraud. This case strikes at the heart of the industry fraud—the unfair and deceptive loans which are laden with massive hidden fees that can amount to more than 30% of the total loan price.

2.      To be sure, much has now been written about the face of the fraud: the door-to-door salespersons that show up on consumers' doorsteps, promising zero electrical bills and tax "rebates"—when, in reality, the electrical bill rarely goes

away entirely, and the tax "rebate" is really just a credit against tax liabilities that simply does not aid the vast majority of solar customers.

3.     But the salespersons and the solar companies employing them are just foot soldiers. They do the bidding of much more powerful financial institutions which profit massively from expensive loans to consumers for solar energy systems. It's those financial institutions that provide the lifeblood of the fraud in the form of ready-to-access money to fund the sales. Without the easy financing, the widespread fraud seen in the solar industry would not be possible.

4.     Dividend is one of a handful of lenders that have cornered the solar loan market. It touts "fintech point-of-sale" systems that enable salespersons to quickly sign consumers up for solar energy loans. In return, Dividend receives a "dealer fee" which can account for more than 30% of the total loan amount. But neither Dividend nor the salespersons tell the consumers about this fee. Instead, they say the opposite: that the financed amount is for the cost of the system itself. The consumer is left with the erroneous notion that Dividend's recompense is in the form of the interest on the loan, as opposed to a huge upfront fee.

5.     As detailed further below, Dividend arms its salespersons with pitches, prevents them from offering "cash" prices for systems that would potentially expose the hidden dealer fee, and creates "fintech point-of-sale" pipelines to funnel consumers into expensive loans.

6.     Through this action, Plaintiff seeks to hold Dividend accountable and for Dividend to be required to compensate Plaintiff and the Class for the money

Dividend extracted from them through its hidden dealer fees, for declaratory and injunctive relief requiring Dividend to conform its conduct to the law, and for all other legal and equitable relief to which Plaintiff and the Class are entitled.

## PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff Emily Torrado is a citizen of Florida. Her home, on which the solar energy system financed through Dividend is installed, and where she resides, is located in Palm Coast, Flagler County, Florida.

8.      Dividend Finance, Inc. is a Delaware corporation with its principal place of business located in San Francisco, California.

9.      Dividend Solar Finance, LLC is a limited liability company formed under the laws of Delaware and headquartered in San Francisco, California. Its sole member, Michael Churchill, is a citizen of California.

10.      Fifth Third Bank is a national banking association which is a citizen of, and maintains its principal place of business in, Ohio and is registered to conduct business in the State of Florida, with a registered agent for service of process in Florida, and no less than 154 locations throughout the State of Florida.

11.      Fifth Third Bank acquired Dividend Solar Finance, LLC and Dividend Finance, Inc. in or around May 10, 2022. Following the acquisition, Fifth Third Bank described Dividend Solar Finance, LLC, and Dividend Finance, Inc. as constituting a "division" of Fifth Third Bank.

12.      Despite becoming a subsidiary of Fifth Third, Dividend's "nerve center" remains in San Francisco, California.

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because at least one Class Member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest. Indeed, this case involves solar energy loans which individually total in the tens of thousands of dollars and the Class includes thousands of members; when those figures are multiplied, the CAFA jurisdictional threshold is readily met.

14.    The Court also has subject matter jurisdiction because Plaintiff brings a claim under a federal cause of action (the "Truth in Lending Act").

15.    This Court has personal jurisdiction over Defendants because Defendants' contacts with the Florida are systematic, continuous, and sufficient to subject them to personal jurisdiction in this Court.

16.    Defendants purposefully avail themselves of the Florida market, including through their financing of many solar energy systems in the State, which is amongst the most populous in the country and well-known for having a large number of sunny days, making it one of the largest solar energy markets in the nation. As a result, Defendants have targeted and profited greatly from the Florida solar energy loan market.

17.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred within this District.

## GENERAL ALLEGATIONS

18.     This case revolves around a scheme in which Dividend is able to procure lucrative finance charges without properly disclosing same. This scheme is effectuated through the collusive relationships Dividend maintains with solar companies, as detailed further below.

**I.     Dividend provides fast and easy money to push solar deals through before the customer can think twice.**

19.     Dividend is a "Finance Partner" to solar sales companies—meaning that it has entered into agreements with those companies to facilitate fast, ready to access financing for expensive solar systems.

20.     Most of the solar companies Dividend partners with engage in high-pressure sales tactics, often effectuated by door-to-door salespersons.

21.     Pursuant to this business model, the salesperson approaches a consumer's home uninvited and attempts to get them to sign a deal for solar that very same day. They employ high-pressure tactics to secure a signature that same day because it's well known within the industry that, the more time a consumer has to think about a transaction, research a company, and discuss same with neighbors and friends, the less likely that consumer is to go through with the deal.

22.      To induce the customer to enter the deal, the salespersons typically promise that the consumer will no longer have to pay an electrical bill because the solar system will completely offset their energy usage. This is very rarely true;

instead, consumers wind up with two bills: one to the electrical company and another to the "Finance Partner"—i.e., Dividend or one of its competitors.

23.     Similarly, the salespersons routinely mischaracterize the federal Investment Tax Credit ("ITC") as a "rebate" entitling the consumer to a check from the government. The ITC is no such thing; instead, it's simply a credit to be offset against tax liability. Most solar customers do not have the tax liability necessary to fully benefit from this credit. And, in any event, the ITC is not a rebate and does not entitle the homeowner to a check from the government.

24.     The door-to-door sales approach is heavily dependent upon the use of small, difficult to read tablets which the salesperson uses to obtain customer signatures. The homeowner is not told that their signature would be transposed onto a written contract, and the homeowner is not given the opportunity to review the terms of a written contract.

25.     The expediency of the transaction is dependent upon quick and easy financing being made available to the customer. This is the pivotal role Dividend plays in the door-to-door solar fraud scheme.

26.     Dividend describes itself as a "fintech" company—a combination of the words "financial" and "technology." Dividend boasts that its fintech has "created an easy straightforward process that enhances installer's ability to close deals fast, and help borrowers finance their projects seamlessly":



Founded in 2013 in San Francisco, Dividend is a leading fintech point-of-sale lender for residential solar and home improvement financing. We created an easy straightforward process that enhances installer's ability to close deals fast, and help borrowers finance their projects seamlessly.

In May 2022, Dividend Finance became a division of Fifth Third Bank. We understand you're investing your time, energy and experience into our company, so it's important to us that we also invest in you. We aim to be the best part of your career journey through career development, a competitive benefits package, a flexible work schedule, a generous time away policy, and a company culture that fosters authentic work relationships, bold ideas, and empowered customers.

27.     The "fintech" developed by Dividend refers generally to a software application/platform which another company, airdev, created for Dividend.

28.     Salespersons can quickly access Dividend's fintech platform via a tablet or smartphone while at the consumer's home and attach built-in financing options as part of their solar energy system proposals. This streamlined process is critical because it prevents the consumer from having time to deliberate the deal, conduct research, speak with others, etc.

29.     Dividend describes its fintech platform as "intuitive technology" which can allow the salesperson to "run the application with a single click," and as a result, allow for the process to go from "[a]pplication to signed docs in under 2 minutes":

7



30.    Dividend similarly touts a "simplified process" with "instant credit approval" and "auto approvals up to $120K," all of which allows for "easier selling" and "same day funding":



31.     Dividend has entered contractual relationships with solar companies which enable those companies to use Dividend's fintech software and provide Dividend loan proposals to customers. Pursuant to those relationships, Dividend provides training, guidelines, and requirements which solar companies are required to follow.

32.     Dividend enables and instructs solar salespersons to help consumers quickly apply for loans during the first sales visit. Dividend's software is designed to streamline this process, allowing the salesperson to apply for a loan in the homeowner's name by simply inputting name, contact information, loan product, and loan amount into the salesperson's tablet or similar device.

33.     Dividend further incentivizes salespersons to push Dividend loans to consumers by providing substantial prizes to those salespersons that meet certain loan sale thresholds. Such prizes include gift cards and electronic devices.

## II.     Dividend instructs salespersons to tout low interest rates and conceal its primary profit center: the dealer fee.

34.      Dividend instructs salespersons to emphasize low annualized percentage rates ("APRs") and low installment payments.

35.     Dividend offers low APRs because interest is not its primary profit source; that, instead, is the hefty, undisclosed up-front dealer fee. As such, Dividend provides very minimal baseline qualification standards (including a minimum credit score and home ownership) for its loans such that most homeowners will qualify.

36. The low installment payments are premised on the notion that the customer will pay a lump sum introductory payment within the first 18 months of the loan term. This lump sum is purportedly to come from the ITC, but as stated above, the credit does not work this way for most customers.

37. More fundamentally, however, the emphasis on low APRs entirely overlooks the fact that the amount financed includes not just the cost of the system, but also a large "dealer fee" which can total more than 30% of the amount financed.

38. The dealer fee is not identified in the Dividend fintech generated quote provided to consumers as part of the solar proposal. Instead, consumers are left with the impression that the loan principal goes entirely towards the hardware and installation costs of the system. In reality, however, the principal has been bloated by the amount of the undisclosed dealer fee.

39. Dividend includes a document entitled "Truth In Lending Act Disclosures" as part of the documents it sends when issuing a new loan. But that document does not accurately identify the fees as required by TILA.

40. Dividend's "Truth In Lending Act Disclosures" form lists the "Annual Percentage Rate" and the "Finance Charge," which it describes as "the cost of your credit as a yearly rate" and "the dollar amount the credit will cost you," respectively. However, the stated "Finance Charge" is really just a calculation of the APR interest payments made over the life of the loan—it does NOT include the dealer fee which is Dividend's primary revenue source from the transaction.

41.   Dividend's "Truth in Lending Act Disclosures" form further identifies the "Amount Financed" as "the amount of credit provided to you or on your behalf," and the "Principal Amount of Loan" as "the sum of all payments Lender is making on Borrower's behalf"—in other words, Dividend represents that the loan proceeds are all going towards the solar company for the system and install costs.

42.   Similarly, Dividend's "Truth In Lending Act Disclosures" form specifies that the "Borrower agrees that proceeds from the loan will solely be used for the design and installation of solar photovoltaic (PV) electricity generation, energy storage, and/or related equipment or improvements"—i.e, Dividend again represents that the proceeds of the loan are to go towards the system and install costs, not towards a large undisclosed dealer fee.

43.   In contrast to its "Truth In Lending Act Disclosures" form, however, Dividend charges a hefty upfront dealer fee that is tacked onto the balance of the loan at the time of origination without the customer's knowledge.

44.   Dividend's dealer fee is part of the loan balance taken out by the consumer, but contrary to Dividend's "Truth In Lending Act Disclosures" form, is not disbursed to the solar installer for parts and installation. Dividend instead retains the dealer fee, and the fee becomes part of the loan balance.

45.   Dividend further structures its deals such that the dealer fee is largely if not entirely paid off during the early term of the loan.

46.   Dividend never discloses the dealer fee to the consumer and the fee is not included in the APR or "Finance Charge" listed in the "Truth In Lending Act

Disclosures" form. Dividend likewise does not describe, identify, or mention the fee in any of its marketing, sales, or loan documents.

47.   Dividend exercises control over the way its loans are presented to solar customers through both its fintech software platform the installers use to generate quotes at the customer's home, as well as through the agreements and business relationships that Dividend separately maintains with the solar companies.

48.   Pursuant to its agreements and business relationships, Dividend instructs its solar company partners and their salespersons to not disclose the dealer fee. Indeed, Dividend goes so far as to instruct solar companies and salespersons to avoid telling the customer the "cash price" of the solar system, as doing so might enable the consumer to deduce the existence of the huge dealer fee.

**III.   Dividend failed to disclose the dealer fee to Plaintiff.**

49.   Plaintiff Emily Torrado received a "Loan and Security Agreement" with Dividend dated January 17, 2023. A copy of this agreement is attached as Exhibit A.

50.   Dividend provided a "Truth In Lending Act Disclosures" form to Plaintiff. As per its standardized practice, Dividend's form did not disclose any dealer fees as part of the transaction.

51.   Instead, Dividend made the representations alleged above with respect to the APR, Finance Charge, Amount Financed, and Principal Amount of the Loan—in other words, Dividend represented that its "Finance Charge" is the

total of the interest payments it will receive over the life of the loan, and that the principal of the loan goes entirely towards the system's material and installation costs.

52.     Consequently, Dividend concealed its dealer fees from Plaintiff, just as it has concealed its dealer fees from the other Class Members.

53.     Plaintiff and the Class had no reasonable means to discover the concealed dealer fee because Defendants colluded with the solar companies to keep the fee secret.

54.     The existence of the dealer fee was recently revealed by the Minnesota Attorney General, who brought an action against Dividend and other solar lenders over this exact issue in March 2024. *See State of Minnesota v. GoodLeap, LLC, Sunlight Financial, LLC, Solar Mosaic, LLC, and Dividend Solar Finance, LLC*, Case No.: 24-cv-01181 (D. Minn.).

## THE STATUTE OF LIMITATIONS ARE TOLLED

55.     Defendants successfully concealed the existence of the dealer fee from Plaintiff and the Class by withholding all mention of same in the financing agreements and by colluding with their solar company partners to not disclose same, as alleged in detail above.

56.     The affirmative acts of Defendants alleged herein, including the acts to conceal the existence of the dealer fee from Plaintiff and the Class, were carried out in a manner that evaded detection.

57.     Indeed, Defendants went so far as to prevent solar companies from offering cash prices to prevent Plaintiff and the Class from independently deducing the existence of the dealer fee.

58.     Because the misconduct was both self-concealing and affirmatively concealed by Defendants, Plaintiff and the Class had no knowledge of the misconduct, or of any facts or information that would have caused a reasonably diligent person to investigate whether misconduct existed.

59.     As a result, the statutes of limitations on the claims brought in this case are tolled or delayed in accrual by operation of the delayed discovery doctrine.

60.     The statutes of limitations are additionally tolled or delayed in accrual by application of the doctrines of fraudulent concealment and estoppel because Defendants took direct action to conceal the existence of the dealer fee from Plaintiff and the Class.

## **CLASS ACTION ALLEGATIONS**

61.     Pursuant to Rules 23(a), 23(b)(2), and 23(b)(3), Plaintiff brings this action on behalf of a proposed National Class, defined as follows:

> ***All persons in the United States who financed solar energy systems with Dividend Solar Finance from January 1, 2013 through today***.

62.     Additionally, pursuant to Rules 23(a), 23(b)(2), and 23(b)(3), Plaintiff will also or alternatively seek certification of a Florida Subclass, defined as follows:

> ***All persons who financed solar energy systems located in Florida with Dividend Solar Finance from January 1, 2013 through today***.

63.     Unless otherwise stated, the term "Class" refers jointly and severally to the National Class and to the Florida Subclass.

64.     Excluded from the Class are: (a) each Defendant and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; and (c) any person who timely and properly excludes himself or herself from the Class.

65.     **Numerosity—Fed. R. Civ. P. 28(a)(1).** The members of the proposed Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable.

66.     Although the precise number of Class Members is unknown to Plaintiff, upon information and belief the Class would easily number in the thousands if not tens of thousands.

67.     **Typicality— Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and the Class all financed solar energy systems through Dividend and were charged undisclosed dealer fees.

68.     Plaintiff and the Class were exposed to the same or substantially similar misrepresentations and omissions—namely, concealment of Dividend's dealer fee.

69.     Plaintiff and each Class member suffered economic damages that are calculable on a class-wide basis. The claims all arise from a single course of conduct

and each Class member would individually make similar legal and factual arguments to establish Defendants' liability.

70. **Rule 23(b)(3) Commonality & Predominance—Fed. R. Civ. P. 23(a)(2) & 23(b)(3).** Plaintiff and the Class are united by a community of interest in obtaining appropriate remedies, including monetary, declaratory, and injunctive relief. This action involves questions of law and fact that are common to the Class that are susceptible to common answers and that predominate over any individual questions specific to any Class member. These include:

    a. Whether Dividend failed to properly disclose its dealer fees to Plaintiff and the Class;

    b. Whether an ordinary reasonable consumer would have financed through Dividend had the dealer fee been disclosed;

    c. Whether Dividend violated the Truth In Lending Act by failing to disclose dealer fees to Plaintiff and the Class;

    d. Whether Dividend violated Florida's Deceptive and Unfair Trade Practices Act by failing to disclose dealer fees to Plaintiff and the Class;

    e. Whether Dividend is liable for common law fraud by failing to disclose dealer fees to Plaintiff and the Class;

    f. Whether Dividend was unjustly enriched by failing to disclose and then collecting dealer fees from Plaintiff and the Class;

g.  Whether Plaintiff and the Class are entitled to monetary damages as a result of Dividend's failure to disclose dealer fees to Plaintiff and the Class;

h.  Whether Plaintiff and the Class are entitled to declaratory and equitable relief as a result of Dividend's failure to disclose its dealer fees; and

i.  Whether Dividend should be subject to punitive or exemplary damages as a result of its failure to disclose its dealer fees.

71.    The common issues will drive the resolution of the litigation in that their determination will resolve in one stroke issues that are central to the validity of each Class member's claims.

72.    These common issues will drive the resolution of the litigation in that their determination will resolve in one stroke issues that are central to the validity of each Class Members' claims.

73.    The factual and legal issues identified above (a) remain common to the Class, (b) arise from a common course of conduct and systemic policy decisions made by Defendants, (c) predominate in number and importance over questions that may not be common to the class, and (d) preclude neither class-wide calculation of damages nor the methodological determination of how such damages should be allocated among Class Members.

74.    **Adequacy of Representation— Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict

with the interests of the Class Members. Plaintiff commits to protecting the interests of the Class without exercising personal interest or otherwise acting in a manner inconsistent with the best interests of the Class generally. Plaintiff has retained attorneys with exceptional experience in complex litigation, including extensive class action experience and experience in handling consumer protection cases. Plaintiff and her attorneys will responsibly, ethically, and vigorously advocate on behalf of the Class and Plaintiff's counsel have ample resources to do so.

75.   **Ascertainably.** The identities of the other Class Members are ascertainable from various sources including Defendants' loan agreements, databases, and other records.

76.   **Predomination.** The common questions of law or fact identified above are substantially similar and predominate over those questions affecting only specific members of the Class.

77.   **Superiority.** The proposed class action is superior to the other means available to the Class to obtain relief.

78.   Defendants have no facially plausible interest in defending against separate, geographically dispersed claims and, in fact, that would be more burdensome to Defendants than defending against all potential claims in a single forum and proceeding.

79.   Likewise, the judicial system has no interest in burdening a number of courts when the claims of this highly cohesive class can be fairly and efficiently concentrated and managed by this Court.

80.   Individualized actions would run the risk of creating inconsistent or contradictory judgments arising from the same set of facts and would increase the likely delay and expense to all parties involved and to the courts, including this Court. By proceeding as a class action, the claims at issue can be managed efficiently through economies of scale.

81.   Ultimately, the class action procedure is superior to other methods of adjudicating Plaintiff's and the Class Members' claims. This is precisely why class actions exist—class treatment facilitates the fair, uniform, and efficient adjudication of claims, as it would here, and it promotes judicial economy while avoiding the undue financial, administrative, and procedural burdens that necessarily would result from a multiplicity of individual actions.

82.   **Rule 32(b) Injunctive and Declaratory Relief—Fed. R. Civ. P. 23(b)(2).** Defendants acted or refused to act on grounds generally applicable to the Class, making the award of equitable relief and/or restitution appropriate to the Class in their entirety.

83.   **Particular Issues—Fed. R. Civ. P. 23(c)(4).** Any or all of the issues identified above are appropriate for certification pursuant to Rule 23(c)(4) because each is particular and common to the Class and the resolution of each or

all would materially advance the disposition of this action and the parties' interests.

84.     Certification of particular issues would move the litigation forward efficiently, saving money, time, and judicial resources for all involved, regardless of whether the action as a whole might be certified.

## COUNTS

### Count I: Violation of the Truth In Lending Act ("TILA")
### On Behalf of the National Class Against All Defendants

85.     Plaintiff reincorporates paragraphs 1 through 84.

86.     Plaintiff brings this claim for violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq., and Regulation Z, 12 C.F.R. Part 1026, on behalf of herself and the National Class.

87.     The form disclosure statements Dividend provided to Plaintiff and the Class did not disclose the complete finance charges and the true amount of the loan, as stated above.

88.     Further, the disclosure statements did not provide accurate itemizations of the complete finance charges.

89.     As a result of the foregoing, the disclosure statements Dividend provided to Plaintiff and the Class violated the requirements of TILA and Regulation Z in the following and other respects:

        a.  By improperly disclosing the finance charge in violation of 15 U.S.C. § 1638(a) and Regulation Z § 1026.18(d); and

b. By failing to make required disclosures, including the **_complete_** finance charge, clearly and conspicuously in writing in violation of 15 U.S.C. § 1632(a) and Regulation Z § 1026.17(a).

90.    As a result of Defendants' TILA violations, Defendants procured undisclosed finance charges from Plaintiff and the Class. The undisclosed finance charges are the difference between the actual amount provided to the solar companies for materials and installation and the disclosed finance charges.

91.    Defendants are liable to Plaintiff and the Class for actual damages, statutory damages of double the finance charges, and attorneys' fees and costs in accordance with 15 U.S.C. § 1640.

92.    Plaintiff seeks all available monetary, declaratory, and injunctive relief to which she is entitled, including all such relief identified in the Prayer for Relief below.

### Count II: Fraudulent Misrepresentation
### On Behalf of the National Class Against All Defendants

93.    Plaintiff reincorporates paragraphs 1 through 84.

94.    Plaintiff brings this claim for fraud on behalf of herself and the National Class on the basis that the state laws involved do not conflict with one another in a case-dispositive manner and they involve the same key elements. Alternatively, Plaintiff brings this claim on behalf of the Florida Class.

95.    Defendants made false statements of fact in representing that the proceeds of the loans would go towards system and installation costs.

96.     Defendants knew that these representations were false because Defendants purposefully designed the agreements such that the dealer fee would be omitted and that, instead, the documents would represent that the proceeds of the loan were going towards system and installation costs.

97.     Defendants' knowledge of the falsity of the representations is further evidenced by their collusive actions in working with the solar companies to conceal the existence of the dealer fee, including by instructing those companies to refrain from offering cash prices for the systems.

98.     Defendants made the false statements in order to induce Plaintiff and the Class to sign onto substantial loans.

99.     Plaintiff and the Class were injured due to Defendants' false statements because they signed and are indebted for expensive solar financing agreements, and they have incurred actual damages, including through payment of undisclosed dealer fees.

100.    Plaintiff seeks all available monetary, declaratory, and injunctive relief to which she and the class are entitled, including all such relief identified in the Prayer for Relief below.

### Count III: Fraud by Omission and Concealment
### On Behalf of the National Class Against All Defendants

101.    Plaintiff reincorporates paragraphs 1 through 84.

102.    Plaintiff brings this claim for fraud on behalf of herself and the National Class on the basis that the state laws involved do not conflict with one

another in a case-dispositive manner and they involve the same key elements. Alternatively, Plaintiff brings this claim on behalf of the Florida Class.

103.   Defendants omitted and concealed the existence of the dealer fee while falsely representing that the proceeds of the loans would go towards system and installation costs.

104.   Defendants were under a duty to disclose the existence of the dealer fee because:

      a.  The fee is a material component of the transaction given its substantial size;

      b.  Dividend's "Truth In Lending Act Disclosures" form purports to disclose "Finance Charges" such that its inherently misleading, deceptive, and inaccurate without inclusion of the dealer fee;

      c.  Defendants had superior and unique knowledge of the undisclosed fee and superior bargaining power;

      d.  The parties' relationship was such that Plaintiff and the Class necessarily depended upon Dividend's truthful and honest disclosures as they had no reasonable means to ascertain the falsity of same; and

      e.  Dividend owed a fiduciary duty to Plaintiff and the Class.

105.   Defendants' knowledge of the falsity of its disclosures is evidenced by the fact that they purposefully designed the agreements such that the dealer fee

would be omitted and that, instead, the documents would represent that the proceeds of the loans would go towards system and installation costs.

106.   Defendants' knowledge of the falsity of the representations is further evidenced by their collusive actions in working with the solar companies to conceal the existence of the dealer fee, including by instructing those companies to refrain from offering cash prices for the systems.

107.   Defendants omitted and concealed the existence of the dealer fee in order to induce Plaintiff and the Class to sign onto substantial loans.

108.   Plaintiff and the Class were injured due to Defendants' false statements because they signed and are indebted for expensive solar financing agreements, and they have incurred actual damages, including through payment of undisclosed dealer fees.

109.   Plaintiff seeks all available monetary, declaratory, and injunctive relief to which she and the Class are entitled, including all such relief identified in the Prayer for Relief below.

### Count IV: Unjust Enrichment
### On Behalf of the National Class Against All Defendants

110.   Plaintiff reincorporates paragraphs 1 through 84.

111.   Plaintiff brings this claim for unjust enrichment on behalf of herself and the National Class on the basis that the state laws involved do not conflict with one another in a case-dispositive manner and they involve the same key elements. Alternatively, Plaintiff brings this claim on behalf of the Florida Class.

112.    Through their wrongful and fraudulent acts and omissions detailed above—namely, concealing the existence of the dealer fee and falsely representing that all proceeds of the loan would go towards system and installation costs—Defendants were able to secure undisclosed finance charges from Plaintiff and the Class.

113.    Defendants knowingly and voluntarily accepted and enjoyed the benefit of increased financial gain, to the detriment of Plaintiff and the Class, who conferred that benefit upon Defendants.

114.    The benefits Defendants received and retained are unjust and inequitable given the methods by which Defendants procured those benefits.

115.    The benefits conferred on Defendants should be disgorged and returned to Plaintiff and the Class as a result of Defendants' actions and omissions.

116.    Plaintiff seeks all available monetary, declaratory, and injunctive relief to which she and the Class are entitled, including all such relief identified in the Prayer for Relief below.

### Count V: Violation of Florida's Unfair and Deceptive Trade Practices Act ("FDUTPA")
### On Behalf of the Florida Subclass Against All Defendants

117.    Plaintiff reincorporates paragraphs 1 through 84.

118.    Plaintiff brings this claim for violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.202, et seq. on behalf of herself and the Florida Subclass against all Defendants.

119.   FDUTPA protects consumers from those "who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat. A violation of FDUTPA may be based on "unfair, deceptive, or unconscionable acts or practices." § 501.203(3)(c), Fla. Stat.

120.   At all relevant times, Plaintiff and the Class Members were "consumers" as defined by Section 501.203(7), *Florida Statutes*.

121.   At all relevant times, Defendants were and are engaged in "trade or commerce" as defined by Section 501.203 (8), *Florida Statutes*.

122.   Defendants engaged in a deceptive and unfair trade practice by:

   a. Concealing the existence of the dealer fee in their financing agreements;

   b. Conspiring with others, including the solar companies, to conceal the dealer fee; and

   c. Falsely representing that the proceeds of the loans were going towards the costs of the system and installation when, in fact, the loan was comprised of a significant hidden dealer fee.

123.   Further, Defendants engaged in per se FDUTPA violations, including their violations of TILA, which is a law that prescribes unfair methods of competition and unfair, deceptive, or unconscionable practices.

124.   As a direct and proximate result of Defendants' FDUTPA violations, Plaintiff and the Class incurred actual damages, including the amount of the

undisclosed dealer fees. They are entitled to recoup those damages in this action, along with declaratory and injunctive relief, attorney's fees, and costs.

125.   Plaintiff seeks all available monetary, declaratory, and injunctive relief to which she and the Class are entitled, including all such relief identified in the Prayer for Relief below.

## **PRAYER FOR RELIEF**

126.   Plaintiff prays that judgment be entered against Defendants as follows:

        a.  That this action be certified as a Class Action;

        b.  That Plaintiff be appointed as Class Representative;

        c.  That Plaintiff's attorneys be appointed Class Counsel;

        d.  For an Order declaring Defendants' conduct to be unlawful;

        e.  For an Order compelling Defendants to make restitution to Plaintiff and the Class in an amount to be proven at trial;

        f.  For actual damages;

        g.  For statutory damages;

        h.  For punitive and exemplary damages;

        i.  For pre and post-judgment interest at the legal rate to the extent available;

        j.  For injunctive and other equitable relief describe above and as necessary to protect the interests of Plaintiff and the Class;

k.  For an Order prohibiting Defendants from engaging in the unlawful, unfair, deceptive, and fraudulent acts described above;

l.  For an Order of restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiff and the Class as a result of their unlawful, unfair, and fraudulent business practices;

m.  For attorneys' fees, costs, and out-of-pocket expenses; and/or

n.  For such other and further relief that the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the Class, demands a trial by jury on all issues triable by right.

Respectfully submitted on April 25, 2024 by:

*/s/ William C. Ourand*
*/s/ Amy L. Judkins*
**C. Richard Newsome, Esq.**
Florida Bar No.: 827258
**R. Frank. Melton, Esq.,**
Florida Bar No: 475440
**William C. Ourand, Esq.**
Florida Bar No.: 92503
**Amy L. Judkins, Esq.**
Florida Bar No.: 125046
NEWSOME MELTON
201South Orange Avenue, Suite 1500
Orlando, Florida 32801
Telephone: (407) 648-5977
Facsimile: (407) 648-5282
Attorney for Plaintiff
ourand@newsomelaw.com
ajudkins@newsomelaw.com

bnagi@newsomelaw.com
lusardi@newsomelaw.com