## UNITED STATES DISTRICT COURT
## MIDDLE DISTIRCT OF FLORIDA
## JACKSONVILLE DIVISION

EMILY TORRADO,

    Plaintiff,

    v.

DIVIDEND SOLAR FINANCE, LLC; FIFTH THIRD BANK, NATIONAL ASSOCIATION d/b/a DIVIDEND FINANCE; and DIVIDEND FINANCE, INC.,

    Defendants.

Case No.: 3:24-cv-00410-TJC-MCR

### AMENDED COMPLAINT

Plaintiff Emily Torrado sues Defendants, Dividend Solar Finance, LLC; Fifth Third Bank d/b/a Dividend Finance; and Dividend Finance, Inc., (collectively, "Dividend"), and alleges:

### BACKGROUND INFORMATION

1. This case arises out of Dividend's predatory lending practices associated with an extension of credit to Plaintiff Torrado for the purpose of purchasing a residential solar energy system.

2. Dividend is a "Finance Partner" to solar sales companies—meaning that it has entered into agreements with those companies to facilitate fast, ready to access financing for expensive solar systems.

3. The solar companies Dividend partners with engage in high-pressure sales tactics, effectuated by door-to-door salespersons.

4.    Pursuant to this business model, the salesperson approaches a consumer's home uninvited and attempts to get them to sign a deal for solar that very same day. They employ high-pressure tactics to secure a signature that same day because it's well known within the industry that, the more time a consumer has to think about a transaction, research a company, and discuss options with neighbors and friends, the less likely that consumer is to go through with the deal.

5.    To induce the customer to enter the deal, the salespersons promise that the consumer will no longer have to pay an electrical bill because the solar system will completely offset their energy usage. This is very rarely true; instead, consumers wind up with two bills: one to the electrical company and another to Dividend.

6.    Similarly, the salespersons routinely mischaracterize the federal Investment Tax Credit ("ITC") as a "rebate" entitling the consumer to a check from the government. The ITC is no such thing; instead, it's simply a credit to be offset against tax liability. Most solar customers, like Plaintiff Torrado, do not have the tax liability necessary to fully benefit from this credit. And, in any event, the ITC is not a rebate and does not entitle the homeowner to a check from the government.

7.    The door-to-door sales approach is heavily dependent upon the use of small, difficult to read tablets which the salesperson uses to obtain customer signatures. The homeowner is not told that their signature would be transposed onto a written contract, and the homeowner is not given the opportunity to review the terms of a written contract.

8.     The expediency of the transaction is dependent upon quick and easy financing being made available to the customer. This is the pivotal role Dividend plays in the door-to-door solar fraud scheme.

9.     Dividend describes itself as a "fintech" company—a combination of the words "financial" and "technology." Dividend boasts that its fintech has "created an easy straightforward process that enhances installer's ability to close deals fast, and help borrowers finance their projects seamlessly":



10.    The "fintech" developed by Dividend refers generally to a software application/platform which another company, airdev, created for Dividend.

11.    Salespersons can quickly access Dividend's fintech platform via a tablet or smartphone while at the consumer's home and attach built-in financing options as part of their solar energy system proposals. This streamlined process is

critical because it prevents the consumer from having time to deliberate the deal, conduct research, speak with others, etc.

12.      Dividend describes its fintech platform as "intuitive technology" which can allow the salesperson to "run the application with a single click," and as a result, allow for the process to go from "[a]pplication to signed docs in under 2 minutes":



13.      Dividend similarly touts a "simplified process" with "instant credit approval" and "auto approvals up to $120K," all of which allows for "easier selling" and "same day funding":



14.     Dividend has entered contractual relationships with solar companies which enable those companies to use Dividend's fintech software and provide Dividend loan proposals to customers.

15.     Pursuant to those relationships, Dividend provides training, guidelines, and requirements which solar companies are required to follow.

16.     The contracts between Dividend and its solar partners provide that Dividend will provide financing to consumers pursuant to a rate sheet that discloses fees associated with various terms for financing.

17.     For example, if the consumer enters into a loan agreement with a 7-year loan term and a 7.99% interest rate, Dividend would not charge the consumer a financing fee. However, the longer the loan term and the lower the interest rate, the higher the financing fee imposed onto the loan amount. Upon information and

belief, for a 25-year loan term at a 2.99% interest rate, Dividend would impose approximately a 30% financing fee into the loan amount.

18.     Dividend takes great steps to keep its contractual terms with solar companies, including the rate sheet, hidden from consumers.

19.     Dividend enables and instructs solar salespersons to help consumers quickly apply for loans during the first sales visit. Dividend's software is designed to streamline this process, allowing the salesperson to apply for a loan in the homeowner's name by simply inputting name, contact information, loan product, and loan amount into the salesperson's tablet or similar device.

20.     Dividend further incentivizes salespersons to push Dividend loans to consumers by providing substantial prizes to those salespersons that meet certain loan sale thresholds. Such prizes include gift cards and electronic devices.

21.     The solar salespersons are authorized by Dividend to solicit loans and to bind homeowners to solar loans with Dividend. To that end, the salespersons represent to homeowners that they are authorized to act on behalf of Dividend.

22.     Dividend instructs salespersons to emphasize low annualized percentage rates ("APRs") and low installment payments.

23.     Dividend offers low APRs because interest is not its primary profit source; that, instead, is the hefty, undisclosed up-front financing fee. As such, Dividend provides very minimal baseline qualification standards (including a minimum credit score and home ownership) for its loans such that most homeowners will qualify.

24.     The low installment payments are premised on the notion that the customer will pay a lump sum introductory payment within the first 18 months of the loan term. This lump sum is purportedly to come from the ITC, but as stated above, the credit does not work this way for most customers.

25.     More fundamentally, however, the emphasis on low APRs entirely overlooks the fact that the amount financed includes not just the cost of the system, but also a large finance charge which can total more than 30% of the amount financed.

26.     The finance charge is not identified in the Dividend fintech generated quote provided to consumers as part of the solar proposal. Instead, consumers are left with the impression that the loan principal goes entirely towards the hardware and installation costs of the system. In reality, however, the principal has been bloated by the amount of the undisclosed finance charge.

27.     Dividend exercises control over the way its loans are presented to solar customers through both its fintech software platform the installers use to generate quotes at the customer's home, as well as through the agreements and business relationships that Dividend separately maintains with the solar companies.

28.     Pursuant to its agreements and business relationships, Dividend instructs its solar company partners and their salespersons to not disclose the true finance charge. Indeed, Dividend goes so far as to instruct solar companies and salespersons to avoid telling the customer the "cash price" of the solar system, as

7

doing so might enable the consumer to deduce the existence of the huge undisclosed finance charge.

29.     Plaintiff Emily Torrado is someone who fell victim to Dividend's predatory lending practices described above.

30.     Through this case, she seeks to rescind the loan she entered with Dividend and to recover her actual damages, statutory damages, and for all other legal and equitable relief to which she is entitled.

<strong><u>PARTIES, JURISDICTION, AND VENUE</u></strong>

31.     Plaintiff Emily Torrado is a citizen of Florida. Her home, on which the solar energy system financed through Dividend is installed, and where she resides, is located in Palm Coast, Flagler County, Florida. This property is the Torrados' principal dwelling. *See* 12 C.F.R. § 1026.23(a).

32.     Dividend Finance, Inc. is a Delaware corporation with its principal place of business located in San Francisco, California.

33.     Dividend Solar Finance, LLC, is a limited liability company formed under the laws of Delaware and headquartered in San Francisco, California. Its sole member, Michael Churchill, is a citizen of California.

34.     Fifth Third Bank is a national banking association which is a citizen of, and maintains its principal place of business in, Ohio and is registered to conduct business in the State of Florida, with a registered agent for service of process in Florida, and no less than 154 locations throughout the State of Florida.

35.     Fifth Third Bank acquired Dividend Solar Finance, LLC and Dividend Finance, Inc. in or around May 10, 2022. Following the acquisition, Fifth Third Bank described Dividend Solar Finance, LLC, and Dividend Finance, Inc. as constituting a "division" of Fifth Third Bank.

36.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff alleges federal claims against Defendants under the Truth in Lending Act and the Equal Credit Opportunity Act.

37.     This Court has personal jurisdiction over Defendants because Defendants' contacts with Florida are systematic, continuous, and sufficient to subject them to personal jurisdiction in this Court.

38.     Defendants purposefully avail themselves of the Florida market, including through their financing of many solar energy systems in the State, which is amongst the most populous in the country and well-known for having a large number of sunny days, making it one of the largest solar energy markets in the nation. As a result, Defendants have targeted and profited greatly from the Florida solar energy loan market.

39.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred within this District.

## FACTUAL BACKGROUND

40.     Plaintiff Emily Torrado is a 69-year-old Hispanic retiree, who lives with and cares for her ailing husband, Lee Torrado, who is 81 years old and suffers

from dementia and Parkinson's disease. Lee and Emily Torrado own a home located in Palm Coast, Florida, which they use as their primary residence.

41.    On or about January 17, 2023, a door-to-door salesman representing Atlantic Key Energy knocked on the door of Plaintiff Torrado's home.

42.    The salesman offered the sale of a residential solar energy system with promises that the solar system would completely offset the Torrado's energy bills. The salesman also represented that the Torrados would receive a check from the government as a tax rebate for 30% of the cost of the system. The Torrados informed the salesman that they were both retired.

43.    As communicated to her by the salesman, the sale of the system would be financed through Dividend Solar Finance on a 25-year loan subject to a 2.99% interest rate.

44.    Plaintiff was provided no other options for financing.

45.    Plaintiff provided her signature on a tablet (like an iPad) without being given an opportunity to review any additional information.

46.    Plaintiff's digital signature was then placed on a contract with the solar installer and on a contract with Dividend Finance (the "Loan Agreement"). (Exhibit 1). Plaintiff never spoke with anyone about the terms of her loan with Dividend Finance other than the door-to-door salesman.

47.    The executed Loan Agreement was emailed to her on January 17, 2023, at 2:19 pm. Plaintiff was never provided an opportunity to review the terms

of the Loan Agreement prior to her signature being digitally transposed onto the Loan Agreement.

48.    A few weeks later, on or around February 3, 2023, Plaintiff Torrado received a call from the salesman informing her that her loan needed to be increased by $3,000.

49.    Plaintiff Torrado made handwritten notes on her original Loan Agreement that reflected the amended loan terms (Exhibit 2). Plaintiff Torrado did not provide a signature for an amended loan agreement.

50.    A copy of an amended agreement ("Amended Loan Agreement") purporting to contain Plaintiff Torrado's digital signature was later included in Dividend Finance's consumer portal. (Exhibit 3).

51.    According to the Amended Loan Agreement, Plaintiff Torrado borrowed $46,711.76, at an annual percentage rate of 2.99%, to be paid back in monthly installments over a 25-year period. The loan was to be used "solely" for "the design and installation for solar photovoltaic (PV) electricity generation, energy storage, and/or related equipment or improvements at the home." (Ex. 3).

52.    The Agreement stated that the full amount of credit ($46,711.76) would be paid directly to the "Seller/Contractor for Collateral and Installation." (Ex. 3, p. 1).

53.    Dividend did not, however, disburse $46,711.76 to the seller/contractor.

54.    That is because the credit extended to Plaintiff Torrado included a hidden and undisclosed finance charge that amounted to approximately 30% of the actual price of the solar energy system.

55.    Upon information and belief, the true cost of Plaintiff's solar energy system was approximately $35,000. Dividend Finance added to that amount an undisclosed finance charge amounting to approximately 30% of the true cost of the solar energy system. This undisclosed finance charge was included in the total "amount financed."

## THE STATUTE OF LIMITATIONS ARE TOLLED

56.    Defendants successfully concealed the existence of the undisclosed finance charge from Plaintiff and the Class by withholding all mention of it in the financing agreements.

57.    Defendants colluded with their solar company partners, including the salesman that approached Plaintiff Torrado, and specifically instructed its partners not to disclose the finance charge, or to disclose the true amount of a cash deal, as that information would inform Plaintiff the true cost of credit, as alleged in detail above.

58.    The collusion between Dividend and its salespersons included fraudulently informing consumers that the solar energy system would replace all of a household energy needs, and that all consumers would benefit from a government tax rebate from the ITC.

59.     The affirmative acts of Defendants alleged herein, including the acts to conceal the existence of the finance charge from Plaintiff, were carried out in a manner that evaded detection.

60.     Indeed, Defendants went to great lengths to keep its contractual relationship with solar companies a secret, including keeping its rate sheet secret from consumers, and even went so far as to prevent solar companies and its salespersons from offering cash prices to prevent Plaintiff from independently deducing the existence of the undisclosed finance charge.

61.     Because the misconduct was both self-concealing and affirmatively concealed by Defendants, Plaintiff had no knowledge of the misconduct, or of any facts or information that would have caused a reasonably diligent person to investigate whether misconduct existed.

62.     As a result, the statutes of limitations on the claims brought in this case are tolled or delayed in accrual by operation of the delayed discovery doctrine.

63.     The statutes of limitations are additionally tolled or delayed in accrual by application of the doctrines of fraudulent concealment and estoppel because Defendants took direct action to conceal the existence of the finance charge from Plaintiff and the Class.

## COUNTS

### Count I: Violation of the Truth In Lending Act ("TILA") for Undisclosed Finance Charge

64.   Plaintiff incorporates the general allegations from paragraphs 1 through 55 above.

65.   Congress has long prohibited predatory lending practice through the Truth in Lending Act ("TILA"). TILA's purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

66.   To effectuate that purpose, TILA mandates that creditors, like Dividend, disclose the "amount financed" as part of the consumer credit transaction, 15 U.S.C. § 1638(a)(2)(A), including any "finance charge" included in the transaction. § 1638(a)(3).

67.   A "finance charge" is defined as "the amount of the finance charge in connection with any consumer credit transaction [and] shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a)

68.   Finance charge is further defined in TILA's implementing regulation (Regulation Z) as "the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4.

14

69.     Under TILA, when a creditor provides written disclosures and an itemization of the amount financed, it must provide those disclosures prior to the extension of credit. 15 U.S.C. § 1638(b)(1).

70.     Defendants extended consumer credit to Plaintiff, making Defendants a "creditor" within the meaning of TILA.

71.     On or about January 17, 2023, Plaintiff agreed to purchase a residential solar energy system from Lumio HX.

72.     The salesman that solicited the sale arranged for financing through Dividend Finance.

73.     The salesman represented that Plaintiff Torrado would borrow the full cost of the solar energy system, which was to be paid back over a 25-year term with 2.99% interest rate.

74.     Plaintiff Torrado was asked to provide her electronic signature on a tablet before she was given the opportunity to review any disclosures associated with the loan agreement.

75.     After providing her electronic signature, a copy of the Loan Agreement was emailed to Plaintiff Torrado. (Ex. 1).

76.     The terms of Plaintiff's Loan Agreement were later amended on or about February 7, 2023.

77.     Plaintiff was never provided an opportunity to review any paperwork associated with the Amended Loan Agreement, and she never provided another digital signature. (Ex. 2).

78.    On both the Loan Agreement and the Amended Loan Agreement, Dividend represented that the full "Principal Amount of the Loan" would be paid directly "To Seller/Contractor for Collateral and Installation":

| ITEMIZATION OF AMOUNT FINANCED | | |
|---|---|---|
| 1.  **Principal Amount of Loan** | $ | 46,711.76 |
|     1.  Amounts Paid to Others on Your Behalf | | |
|         **a.**  To Seller/Contractor for Collateral and Installation | $ | 46,711.76 |
| 2.  **Amount Financed** | $ | 46,711.76 |

(Ex. 3).

79.    This statement is false. Dividend did not pay $46,711.76 directly to the Seller/Contractor on behalf of Plaintiff Torrado, but upon information and belief paid only approximately $35,000, which reflects the true cost of the goods and services purchased by Plaintiff Torrado.

80.    If Plaintiff had agreed to pay cash for her solar energy system, the cost would have been approximately $35,000.

81.    The "Truth in Lending Act Disclosures" provided in both the Loan Agreement and Amended Loan Agreement did not include a nearly 30% finance charge imposed onto Plaintiff Torrado as the cost of borrowing money from Dividend.

82.    The failure to disclose the true terms of the cost of borrowing money from Dividend violates the requirements of 15 U.S.C. § 1638(a)(3). Defendants also failed to provide any required disclosures prior to extension of credit in violation of § 1638(b)(1).

83.     The actions of Defendants have caused substantial injury to the Plaintiff.

84.     Defendants are liable to Plaintiff for actual damages, statutory damages of double the finance charges, and attorneys' fees and costs in accordance with 15 U.S.C. § 1640.

85.     Plaintiff seeks all available monetary, declaratory, and injunctive relief to which she is entitled.

### Count II: Violation of the Truth In Lending Act ("TILA") for Right of Rescission

86.     Plaintiff incorporates the general allegations from paragraphs 1 through 55 above.

87.     TILA provides consumers with a right to rescind certain credit transactions "until midnight of the third business day following the following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later." 15 U.S.C. § 1635(a).

88.     The right to rescind applies to "credit transaction in which a security interest is or **will be** retained or acquired in a consumer's principal dwelling." *Id.* (emphasis added).

89.     A "security interest" means "an interest in property that secures performance of a consumer credit obligation and that is recognized by state or

federal law," 12 C.F.P. § 226.2(a)(25). For purposes of the right of rescission, a security interest includes mechanics' and materialmen's liens that are or "*will be retained or acquired in a consumer's principal dwelling.*" *Id.*; Office Staff Comment, § 226.2(a)(25). "The effect of these regulations is that [creditors] are required to notify a customer of his right to rescind when there is a *probability* that a lien on his house will arise by operation of law even though he has not executed an indenture on the property." *Gardner & N. Roofing & Siding Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 464 F.2d 838, 841 (D.C. Cir. 1972) (emphasis added); *Rudisell v. Fifth Third Bank*, 622 F.2d 243, 249 (6th Cir. 1980).

90.     The notice of the right to rescind must be provided to the consumer "on a separate document that identifies the transaction and shall clearly and conspicuously disclose":

> (i) The retention or acquisition of a security interest in the consumer's principal dwelling.
> (ii) The consumer's right to rescind the transaction.
> (iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.
> (iv) The effects of rescission, as described in paragraph (d) of this section.
> (v) The date the rescission period expires.

12 C.F.R. § 1026(b)(1).

91.     These technical requirements of TILA are strictly enforced. *Reneau v. Mossy Motors*, 622 F.2d 192, 195 (5th Cir. 1980); *In re Pittman*, No. 03-90154-MGD, 2004 WL 5848054, at *3 (Bankr. N.D. Ga. Dec. 22, 2004) ("TILA violations

are measured by a strict liability standard imposing liability on the offending creditor even for minor or technical violations.").

92. The Loan Agreement and Amended Loan Agreement are credit transactions that a security interest is or will be retained or acquired on Plaintiff Torrado's principal dwelling.

93. Indeed, Plaintiff Torrado's contracts with the solar installer and with Dividend warn that the credit transaction could result in liens on her property. As such, Plaintiff was entitled to rescind the contracts within 3 business days following "the delivery of the information and rescission forms." 15 U.S.C. § 1635(a).

94. To date, Plaintiff has yet to receive notice of her rescission rights that complies with disclosure requirements of 12 C.F.R. § 1026(b)(1).

95. As a result of Defendants failure to properly disclose the right of rescission, coupled with the other disclosure violations discussed in Count I, Plaintiff Torrado is entitled to rescind the Amended Loan Agreement pursuant to 15 U.S.C. § 1635(a) and 12 C.F.R. § 1026.23(a)(3).

96. The actions of Defendants have caused substantial injury to the Plaintiff.

97. Plaintiff seeks rescission of the credit transaction with Defendants, actual damages, statutory damages, and further relief, including punitive damages for willful noncompliance, as permitted under TILA and Regulation Z.

**Count III: Violation of the Equal Credit Opportunity Act ("ECOA")**

98.     The Equal Credit Opportunity Act ("ECOA") was originally enacted to prohibit discrimination in credit transactions. 15 U.S.C. § 1691.

99.     To facilitate the protection mechanisms provided by ECOA, a creditor that receives an application of credit shall request certain information regarding ethnicity, race, sex, marital status, and age. The application is required to include the following disclosures:

> The creditor shall inform the applicant(s) that the information regarding ethnicity, race, sex, marital status, and age is being requested by the Federal Government for the purpose of monitoring compliance with Federal statutes that prohibit creditors from discriminating against applicants on those bases. The creditor shall also inform the applicant(s) that if the applicant(s) chooses not to provide the information, the creditor is required to note the ethnicity, race and sex on the basis of visual observation or surname.

12 C.F.C. § 1002.13(c). Failure to provide the required ECOA disclosures is a violation of ECOA subject to statutory penalties. 15 U.S.C. § 1691e.

100.    15 U.S.C. § 1691(d) requires that applicants be with written notice when adverse action was taken against them regarding their credit. 15 U.S.C. § 1691(d)(2)-(3).

101.    An adverse action is defined to include "a change in the terms of an existing credit arrangement." § 1691(d)(6).

102.    The notice requirement is intended to discourage discriminatory practices, provide consumers with a "valuable educational benefit," and allow for the correction of errors "where the creditor may have acted on misinformation or

inadequate information." *Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 576 (6th Cir. 2016) (quoting S. Rep. No. 94–589, at 4 (1976)).

103.   The adverse-action notice requirement provides:

(2) Each applicant [for credit] against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by—

(A)   providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

(B)   giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

(3) A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken.

15 U.S.C. § 1691(d).

104.   A creditor is required to "notify an applicant of action taken within: (iii) 30 days after taking adverse action on an existing account." 12 C.F.R. § 1002.9(a)(1).

105.   The notice must include "a statement of specific reasons for the action taken" or "a disclosure of the applicant's right to a statement of specific reasons within 30 days, if the statement is requested within 60 days of the creditor's notification." 12 C.F.R. § 1002.9(a)(2).

106.    Regulation B defines "applicant" as "any person who requests or who *has received an extension of credit* from a creditor." 12 C.F.R. § 1002.2(e) (emphasis added).

107.    Plaintiff received an extension of credit on January 17, 2023, pursuant to the Loan Agreement, and is an "applicant" under 12 C.F.R. § 1002.2(e).

108.    Defendants are "creditors" under § 1002.2(l).

109.    The Loan Agreement and Amended Loan Agreement are credit transactions that "will be secured by the dwelling." As such, Defendants were required to provide certain information and disclosures for monitoring purposes. 12 C.F.R. § 1002.13.

110.    Defendants' application for credit did not include the information required by § 1002.13(a), nor did it include the disclosures required by § 1002.13(c), resulting in a clear violation of ECOA.

111.    Defendants terminated Plaintiff's Loan Agreement sometime on or around February 7, 2023, and increased the total loan amount by $3,000 pursuant to the Amended Loan Agreement. (Ex. 2). Defendants' conduct is not excluded from the definition of "adverse action" under 12 C.F.R. § 1002.2(c)(2) and is thus considered an "adverse action" against Plaintiff.

112.    On or around February 7, 2023, Plaintiff received a phone call from the salesperson that solicited her loan informing her of the credit increase. Plaintiff did not receive any written disclosures related to this credit increase and did not

22

receive a written "statement of specific reasons for the action taken" or "a disclosure of the applicant's right to a statement of specific reasons."

113.   Defendant's failure to provide Plaintiff with a written notification with such disclosures violates Regulation B and the ECOA.

114.   Defendant's violation of the ECOA denied Plaintiff the "pervasive and valuable educational benefit" that Congress found would come from knowing the reasons for Defendant's adverse action.

115.   Plaintiff, having suffered a violation of the ECOA and having been deprived of the valuable educational benefits Congress intended ECOA's notice requirement to confer, is an "aggrieved applicant" under 15 U.S.C. § 1691e.

116.   In committing the ECOA violations alleged herein, Defendant acted in reckless disregard of the ECOA, warranting imposition of punitive damages against Defendant under 15 U.S.C. § 1691e(b).

117.   Plaintiff seeks all available monetary, declaratory, and injunctive relief to which she is entitled.

## **PRAYER FOR RELIEF**

118.   Plaintiff prays that judgment be entered against Defendants as follows:

    a. For an order declaring Defendants' conduct to be unlawful;

    b. For an Order compelling Defendants to make restitution to Plaintiff in an amount to be proven at trial;

    c. For actual damages;

d.  For statutory damages;

e.  For punitive and exemplary damages;

f.  For injunctive and other equitable relief as necessary to protect the interests of Plaintiff;

g.  For pre- and post-judgment interest at the legal rate available;

h.  For attorneys' fees, costs, and out-of-pocket expenses; and/or

i.  For such other and further relief that the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues triable by right.

Respectfully submitted on August 12, 2024, by:

/s/ Amy L. Judkins
**Amy L. Judkins, Esq.**
Florida Bar No.: 125046
**William C. Ourand, Esq.**
Florida Bar No.: 92503
NEWSOME MELTON
201South Orange Avenue, Suite 1500
Orlando, Florida 32801
Telephone: (407) 648-5977
Facsimile: (407) 648-5282
Attorney for Plaintiff
ourand@newsomelaw.com
ajudkins@newsomelaw.com
bnagi@newsomelaw.com
lusardi@newsomelaw.com